UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES DISTRICT COURT
RECEIVED
JUN 01 2009
MICHAEL J. ROEMER, CLERK
WESTERN DISTRICT OF NY

UNITED STATES OF AMERICA,

**REPORT, RECOMMENDATION
AND ORDER**

v.

RAYMOND MASON,

07-CR-141(A)(M)

                    Defendant.

_____

      This case has been assigned to me by Hon. Richard J. Arcara for supervision of pretrial proceedings (Dkt. #31).[1] Before me are defendant's motion to suppress statements and evidence [36][2] and the government's motion *in limine* to preclude the testimony of defendant's expert, Thomas J. Langan, M.D., concerning defendant's mental condition [62]. An evidentiary hearing was held on January 22, 23 and February 10, 2009 [68, 69, 76, 83], and oral argument was held before me on February 18 and April 30, 2009.

      For the following reasons, the government's motion *in limine* is DENIED, and I recommend that defendant's motion to suppress likewise be DENIED.


## BACKGROUND

      By indictment dated June 20, 2007 [19], defendant is charged with possession and production of child pornography, in violation of 18 U.S.C. §§2251(a), 2252A(a)(5)(B) and 2252A(a)(2)(B). Defendant has moved to suppress statements and physical evidence, and an

---

[1]     Bracketed references are to CM/ECF docket entries.

[2]     Although defendant's motion initially requested other forms of relief in addition to suppression, defendant has conceded that those requests are now moot in light of the government's response [51,52].

evidentiary hearing was conducted, at which the following witnesses testified: Postal Inspector Paul E. Blum, FBI Special Agent Michael A. Shaffer, City Of Ellicottville Police Detective Bradley Knight, and Thomas A. Langan, M.D. Except where otherwise indicated, I find their testimony to be credible, and adopt it as my findings of fact.

In June 2003 an investigation began into a global child pornography ring. A search warrant of a credit card processor in Florida yielded the names of 37,000 child pornography customers, including defendant [68/3,4].[3] Postal inspector Richard Irvine sent a letter to defendant to see if he was interested in obtaining child pornography [68/4-5]. The letter mentioned a company with access to private videos, including adult and child pornography, and asked him to specify his areas of interest [68/5]. Defendant responded by letter [Gov't. Ex.1, Ex. A], indicating that he was interested in preteen girls and incest [68/8]. His response letter was sent in an envelope bearing his name and address, 9 South Chicago Street, Jamestown, NY [68/8-9].

Irvine then sent a letter to defendant at that address [Gov't. Ex.1, Ex. B] containing an order form and three pages of detailed descriptions of the videos offered for sale. Defendant completed and returned the order form, enclosing $85 in cash for three videos [Gov't. Ex. 1, Ex.

---

[3]     Defendant also sought suppression of the evidence seized as result of the credit card processor [36/4-5]. I orally denied that motion at the January 6, 2009 proceeding, finding that defendant had no expectation of privacy in this information and therefore lacked standing to challenge the search warrant [71]. *See* United States v. Miller, 425 U.S. 435, 443 (1976) ("This Court has held repeatedly that the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed."); Guest v. Leis, 255 F. 3d 325, 336 (6th Cir. 2001) ("A bank customer . . . does not have a legitimate expectation of privacy in the information that he or she has conveyed to the bank; by placing the information under control of a third party, the customer assumes the risk that the bank will convey the information to the government.").

C; 68/10-11]. At that point, Inspector Blum prepared an affidavit for an anticipatory search warrant for 9 South Chicago Street, which was submitted to and approved by Magistrate Judge Leslie Foschio [Gov't Ex. 1; 68/12]. Judge Foschio also approved the use of an electronic monitoring device, to be placed in the package of videotapes addressed to defendant, which would emit a signal when the package was opened. The warrant was not to be executed until the package was opened [68/12-13].

The package was delivered to 9 South Chicago Street on July 18, 2005 at 1:30 p.m. [68/15]. At 3:00 p.m., the package was taken inside the house by a woman [68/16]. At 7:00 p.m., Inspector Blum retrieved the package from the woman, Rhonda Vinton, who told him that defendant had recently moved out from 9 South Chicago, and was now residing at 16 Jefferson Street in Frewsburg [68/16-17]. Inspector Blum, accompanied by FBI agent Michael Shaffer, proceeded to 16 Jefferson Street and spoke with defendant's mother, who told them that he lived with her but was not home at the time. She accompanied them to 515 Crescent Street in Jamestown, where defendant was visiting his son [68/18].

They knocked on the door and spoke to Nancy Schoonover, who directed them to defendant, who was in the carport area, working on a car [68/19]. Inspector Blum showed defendant his credentials and badge, and gave him the package [68/21]. He asked defendant to open it, which he did, and asked whether he had ordered it. Defendant acknowledged that he had [68/22]. He appeared slightly reluctant to open the package, as though he didn't want to look inside [68/22].

Inspector Blum asked defendant to return with them to 16 Jefferson Street to talk further, but stated that he did not have to go with them. Defendant agreed to go with them

-3-

[68/22]. Blum testified that if he had said no, they would have left [68/23]. Blum and Shaffer were both dressed in plain clothes [68/23]. Other officers were also dressed in plain clothes, 40-50 feet away [68/23].

Upon arriving back at 16 Jefferson, Blum suggested to defendant that they speak at a picnic table on patio outside the house at 16 Jefferson [68/25]. Defendant sat with his back to the house, and Blum and Shaffer sat across from him [68/26]. Immediately upon sitting down at the picnic table, Blum provided defendant with a "Warning and Waiver of Rights" form [Gov't. Ex.2; 68/28]. He gave defendant a blank form, read him the warnings verbatim, and asked defendant to read along with him [68/28-29]. After reading the warnings, he asked defendant if he was willing to speak with them, and defendant said that he was [68/29]. Blum asked defendant to fill out the date and time, and sign his name [68/29]. He told defendant: "now that you know your rights, you also need to waive your rights . . . . now that you know what your rights are, I need you to waive your rights. And I read to him the paragraph underneath waiver and again asked him to sign" [68/31]. As Blum read defendant his rights, he asked him if he understood, and defendant said that he did [68/32]. According to Blum, defendant was free to leave if he decided to stop speaking [68/36].

Defendant admitted to visiting 50 child porn websites which he paid for with a credit card [68/38]. He admitted ordering the package from Tom's video [68/38]. He initialed Gov't. Ex.3 (his order form) and Gov't. Ex.4 (the envelope for the order form) [68/39]. He also executed a "Consent to Assume Online Identity" [Gov't. Ex. 5] and provided his e-mail address and password [68/39]. Blum explained to defendant that he did not need to give consent [68/40].

-4-

Blum then took a written statement from defendant, and told him that his cooperation would be brought to the attention of the U.S. Attorney [68/41]. Defendant wrote the statement himself [Gov't. Ex.6; 68/41]. He was given the opportunity to change what he had written [68/43]. In the statement, defendant indicated that "I ourder the videos not knowing what I was doing couse my brain is a mess couse I do not have all my brain do to my eleasp [epilepsy] and it takes part of my brain when I have one so I am all mest up in my head and don't know what to do at tims and yes I nead help couse my brain has a hard time of what is right and rong some times . . . I may have seeine about 50 sites witch girls in them witch out coules [clothes]." [Gov't. Ex. 6].

After defendant completed the written statement, Blum asked him whether he would consent to a search of his residence. He refused [68/44]. However, he did consent to a search of his computer [Gov't. Ex.7; 68/45]. He told them that there would be no child pornography on the computer [68/45].

Blum also asked defendant whether he had ever touched a child, and defendant said no [68/46]. He asked if defendant would take a polygraph examination, but defendant refused [68/46]. Blum stated that his answers were appropriate to the questions asked, and were logical [68/46-47]. No physical force was used to obtain his consent, nor was he coerced in any way [68/47]. At no point did defendant request an attorney or to terminate the interview [68/47]. He was free to leave at all times on July 18, and was not arrested on that date [68/47-48].

During the interview, defendant also mentioned that he had seen two young girls naked at 9 South Chicago Street [68/48, 117]. Blum later asked Det. Knight to interview the girls, which he did on July 19 [69/5]. One of the girls told Knight that defendant had photographed her

nude [68/48, 69/5-6]. Knight called Blum after he interviewed her, and told him that without defendant's confession, it would only be a misdemeanor [68/102, 69/26]. Blum told him that federal case would have more severe penalty [69/26-7].

Based upon that information, on July 21, 2005 Inspector Blum applied for second search warrant from Magistrate Judge Foschio for 16 Jefferson Street in Frewsburg [68/48]. That warrant [Gov't. Ex. 8] was executed on July 22, 2005 [68/49]. Blum arrived at that premises at approximately 6:15 a.m. on July 22, as defendant was preparing to leave for work [68/49]. Agent Shaffer was with him [68/51]. They went to the patio (the same location as the July 18 conversation), and Blum again asked defendant if he would speak to him, repeating the <u>Miranda</u> warnings [68/49], and using the same form as Gov't. Ex. 2 [68/50]. This time, however, defendant was not willing to sign the waiver form. "I don't recall the exact words that he said, but he was not willing to fill out the form" [68/50].

Blum told Knight that defendant would not talk to him, and asked him to "give it a try to speak with him" [69/30]. He did not tell Knight what to discuss [69/33]. Knight approached defendant on the patio [69/7] and introduced himself. He told him he was a detective, and asked if he minded if they spoke. Defendant said he didn't mind [69/8]. He gave defendant another "Warning and Waiver of Rights" form [Gov't. Ex. 10] and read him the warnings [69/8-9]. Knight filled out the form and defendant looked it over. For each warning, he asked if defendant understood, and defendant said yes [69/10], and acknowledged that he was willing to speak [69/13-14]. Prior to the warnings, no questioning occurred [69/14]. Knight stated that defendant's answers were appropriate to the questions and logical [69/14-15]. No force or

coercion was used. Defendant never asked for an attorney or to leave [69/15], although he was free to do so [69/16].

Knight prepared a written summary of what defendant told him. For any inculpatory admission, he had defendant repeat the statement before he wrote it out [69/18-19]. Defendant reviewed the statement before signing, and initialed a few corrections [Gov't. Ex. 11]. Before concluding, Knight asked defendant if he'd like to add anything, and defendant added the following statement as to why he had photographed the young girls naked: "All I can say is I had a malfunction in my brain. That is the only way I can figure out why I took these naked photos" [Gov't. Ex. 11; 69/19-20].

Thereafter Inspector Blum contacted AUSA Allision Gioia, and told her what defendant had said, and what they had found during the search of the premises [68/58]. Based upon her instructions, defendant was then placed under arrest [68/59].

On October 24, 2008, defendant was examined by Dr. Thomas J. Langan [83/5], who was stipulated to be an expert in neurology [76/9]. In addition to his examination, which lasted 55 minutes [83/5], Dr. Langan reviewed the statements which defendant had given, the warning forms administered to him, and his school and medical records [Def't. Ex. B].

Although he could not offer a definitive diagnosis of defendant without additional testing, Dr. Langan stated that it is "clear that he has a neurological disability", based upon "significant neurological abnormalities" [76/5, 13]. He concluded that defendant's function level is that of a second or third grader [76/13]. While he did not administer an IQ test, Dr. Langan noted that defendant's school records indicate that his "whole scale IQ was 74" [83/13], which would be classified as borderline mentally retarded [83/14].

However, he acknowledged that defendant was competent to stand trial,[4] could read and write [83/37], had a high school attendance diploma [83/37], and had a driver's license [83/47-8]. He noted that defendant was alert and could answer questions, but that his fund of information was extremely limited [76/6-7]. He admitted that in simple conversation, it would appear that defendant was answering appropriately [76/17].

Dr. Langan concluded that an individual like defendant could not knowingly waive his rights [76/12-13], and that he would be "predisposed, based on his child-like intellect, to go along with authority figures" [83/48]. However, he admitted that "in any specific instance, there would be other factors that determine whether he would or wouldn't. Like whether he was happy, whether he was sad, whether he was anxious . . . . So predisposition doesn't mean that in every single instance, they would accede to the expectation of the authority figure" [83/48-9].

## DISCUSSION AND ANALYSIS

## I. THE GOVERNMENT'S MOTION *IN LIMINE* [62]

The admissibility of Dr. Langan's testimony depends on the issue raised by defendant's motion:

### A. As to Defendant's Custodial Status

"A suspect is entitled to *Miranda* warnings only if he or she is interrogated while 'in custody.'" Tankleff v. Senkowski, 135 F. 3d 235, 243 (2d Cir. 1998). "In determining whether a suspect was in custody, we look at all the circumstances surrounding the interrogation.

---

[4] In April 2008 Judge Arcara ordered defendant to undergo a psychiatric examination by Michael J. Lynch, M.D. [42], who concluded that he was competent to stand trial [46].

The relevant inquiry is 'how a reasonable man in the suspect's position would have understood his situation.' . . . . And custody exists for *Miranda* purposes if a reasonable person in that position would 'have felt he or she was not at liberty to terminate the interrogation and leave.'" Id.

"The *Miranda* custody inquiry is an objective test . . . . designed to give clear guidance to the police." Yarborough v. Alvarado, 541 U.S. 652, 667, 668 (2004). "We do not ask police officers to consider . . . contingent psychological factors when deciding whether suspects should be advised of their *Miranda* rights . . . . The inquiry turns too much on the suspect's subjective state of mind and not enough on the 'objective circumstances of the interrogation.'" Id. at 668-669.

Therefore, I agree with the government that Dr. Langan's testimony as to defendant's mental limitations is irrelevant to the question of whether defendant was "in custody" at the time of his interrogations on July 18 and 22, 2005. However, because he did not offer an opinion on that issue, that aspect of the government's motion is moot.

### B.    As to the Voluntariness of Defendant's Waivers

By contrast, expert testimony as to defendant's mental limitations *can* be relevant on the question of whether his waiver of his constitutional rights was voluntary or coerced. "The objective *Miranda* custody inquiry could reasonably be viewed as different from doctrinal tests that depend on the actual mind set of a particular suspect . . . . For example, the voluntariness of a statement is often said to depend on whether 'the defendant's

will was overborne,' . . . a question that logically can depend on 'the characteristics of the accused,' . . . . The characteristics of the accused can include the suspect's age, education, and intelligence." <u>Yarborough</u>, <u>supra</u>, 541 U.S. at 667-668.

Thus, "the law is clear that a person's age or mental impairment [can be] relevant to an analysis of whether police behavior was coercive . . . . The Supreme Court has stated that ' . . . mental condition is surely relevant to an individual's susceptibility to police coercion'. <u>Colorado v. Connelly</u>, 479 U.S. 157, 165 (1986)". <u>Smith v. Sullivan</u>, 1 F. Supp. 2d 206, 215 (W.D.N.Y. 1998) (Larimer, J.). "The fact that one subjected to police interrogation is of subnormal intelligence is merely one factor (although it may be an important factor) affecting the voluntariness of his confession or inculpatory statement". <u>Annotation</u>: "Mental Subnormality of Accused as Affecting Voluntariness or Admissibility of Confession", 8 A.L.R.4th 16, §3.

Given the possibility of coercion in this case (for example, Inspector Blum testified that he "would have told [defendant] that now that you know your rights, *you also need to waive your rights* . . . . now that you know what your rights are, *I need you to waive your rights*" [68/31, emphasis added]), Dr. Langan's testimony as to defendant's mental limitations is "one factor" which I may consider in resolving the issue of whether his consent was voluntary.

### C.  <u>Daubert</u> Considerations

The government notes that "the defendant bears the burden of proof by a preponderance of the evidence to show that the neurologist's testimony and related evidence are admissible under Rule 702 of the Federal Rules of Evidence. <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579, 591-93 n. 10 (1993)". Government's Memorandum of Law

[66], p. 10. "In making a preliminary determination of admissibility under Rule 702, the Court must find that the expert evidence satisfies two requirements. First, the evidence must be objectively reliable and trustworthy . . . . Second, the evidence must be relevant and actually assist . . . in deciding a specific fact issue." Id.

Both of these requirements are satisfied in this case. As stated previously, I have concluded that Dr. Langan's testimony is relevant to the issue of voluntariness of the waiver of his Fourth and Fifth Amendment rights. As to reliability, it bears repeating that the government has stipulated to his expertise in the field of neurology. Dr. Langan has based his opinion upon his personal examination of defendant and his review of numerous documents, including defendant's medical and school records and the statements which he gave to investigators.

I conclude that this methodology provides sufficient indicia of reliability to warrant the admission of Dr. Langan's testimony. "To assess the reliability of a proffered expert's testimony, the court's inquiry under *Daubert* and its progeny must focus on whether his conclusions are based on a reliable foundation, not on the substance of his conclusions or whether they are correct." Pugliano v. United States, 315 F. Supp. 2d 197, 199 (D. Conn. 2004).

Therefore, in the exercise of my discretion,[5] I have considered Dr. Langan's testimony concerning defendant's mental condition and limitations as they relate to the voluntariness of his confessions and consent to search. If that testimony were likely to affect my decision as to suppression, I would allow the government the opportunity to submit expert

---

[5]     "The decision to admit expert testimony is left to the broad discretion of the trial judge." McCullock v. H.B. Fuller Co., 61 F. 3d 1038, 1042 (2d Cir. 1995).

evidence opposing Dr. Langan's conclusions.[6]  However, for reasons discussed in Point II of this opinion, it does not.


## II.    DEFENDANT'S MOTION TO SUPPRESS [36]

### A.    Defendant's Statements and Consents

In order to prove that defendant validly waived his constitutional rights, "the government must show (1) that the relinquishment of the defendant's rights was voluntary, and (2) that the defendant had a full awareness of the right being waived and of the consequences of waiving that right . . . . Only if the totality of the circumstances reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." United States v. Male Juvenile, 121 F. 3d 34, 39-40 (2d Cir. 1997). "The test for determining the voluntariness of a confession is whether, considering the totality of the circumstances, the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne." Smith v. Sullivan, 1 F. Supp. 2d 206, 213 (W.D.N.Y. 1998) (Larimer, J.).

"In applying the totality of the circumstances test, those factors that a court should consider to determine whether an accused's confession is voluntary center around three sets of circumstances:  (1) the characteristics of the accused, (2) the conditions of interrogation, and (3)

---

[6]    Defendant argues that I may order defendant to submit to a mental examination by the government only where defendant intends to invoke an insanity defense, citing Fed. R. Crim. P. 12.2. Defendant's Post-Hearing Memorandum [78], pp. 21-23. However, "that Rule is not an exclusive source of the power to order a mental examination . . . [and] does not extinguish a trial court's inherent power to order a mental examination under appropriate circumstances". United States v. McSherry, 226 F. 3d 153, 155 (2d Cir. 2000). "If the defense relies on expert testimony as to the defendant's mental state, it is estopped from depriving the government of an opportunity to examine the defendant." Id. at 156.

the conduct of law enforcement officials." Green v. Scully, 850 F. 2d 894, 901-02 (2d Cir. 1988), cert. denied, 488 U.S. 945 (1988). While each of these factors must be considered, "no single factor determines whether a confession is voluntary". United States v. Jaswal, 47 F. 3d 539, 542 (2d Cir. 1995).

### 1.    Defendant's Characteristics

"The relevant characteristics of the individual who confessed are the individual's experience and background, together with the suspect's youth and lack of education or intelligence." Green, supra, 850 F. 2d at 902. Understandably, defendant relies heavily upon his mental limitations in arguing that he could not have voluntarily waived his rights. While it is clear to me that defendant suffers from some level of mental limitation, I note that he can read and write,[7] possesses a driver's license [83/47-48], and has a high school diploma (albeit an "attendance diploma")[83/37]. Defendant was 22 years old in July 2005 (DOB 12/25/72) [83/60]. Moreover, as the government notes, in ordering the videos defendant was savvy enough to calculate his entitlement to a "volume discount".[8]

"The law is clear that a person's age or mental impairment, while relevant to an analysis of whether police behavior was coercive, will not suffice to show involuntariness if the record as a whole indicates that the person understood his rights and freely chose to waive them." Smith, supra, 1 F. Supp. 2d at 215. See also Lawrence v. Artuz, 91 F. Supp. 2d 528, 535-36

---

[7]    Although defendant's handwritten statement [Gov't. Ex. 6] is replete with misspellings, the inability to spell properly does not in itself suggest a severe mental deficiency.

[8]    See Gov't. Ex. 1, Ex. C ("videos are $30 each or two for $50").

(E.D.N.Y. 2000) ("A knowing relinquishment of *Miranda* rights can be found even where a defendant has only limited intellectual capacity. Thus, even a defendant who is classified as mildly retarded or having learning disabilities may waive his rights if he can comprehend sufficiently the particular rights set forth in *Miranda*"); Male Juvenile, supra, 121 F. 3d at 40. In fact, defendants both younger and with IQs lower than this defendant have been determined to be capable of voluntarily waiving their constitutional rights. *See* Smith, supra, 1 F. Supp. 2d at 216-17.

Defendant argues that his repeated references to problems with his brain show his diminished mental capacity. However, when read in the context of defendant's full statements, I interpret those references as being defendant's not-too-subtle attempt to exculpate himself from the consequences of his actions,[9] and conclude that his ability to formulate this excuse is more indicative of mental capacity than of incapacity.

### 2.    The Conditions of Interrogation

"The second circumstance, the conditions under which a suspect is questioned, includes the place where an interrogation is held . . . the length of detention . . . [and] the presence or absence of counsel. Green, supra, 850 F. 2d at 902.

Defendant argues that he was in custody during his interrogation on July 18 and 22, 2005. Defendant's Post-Hearing Memorandum [78], pp. 10-13. "In determining whether a

---

[9]    "I ourder the videos not knowing what I was doing couse my brain is a mess . . . I nead help couse my brain has a hard time of what is right and rong some times I am sory if it hapens" [Gov't Ex. 6]; "All I can say is I had a malfunction in my brain. That is the only way I can figure out why I took these naked photos" [Gov't. Ex. 11].

-14-

suspect was in custody, we look at all the circumstances surrounding the interrogation. The relevant inquiry is 'how a reasonable man in the suspect's position would have understood his situation'. . . . And custody exists for *Miranda* purposes if a reasonable person in that position would 'have felt he or she was not at liberty to terminate the interrogation and leave.'" Tankleff, supra, 135 F. 3d at 243.

Defendant suggests that "a reasonable person *with profound mental deficiencies* (like Mr. Mason) would likely believe that he was not free to leave or terminate the interview", defendant's Post-Hearing Memorandum [78], p. 12, and that "any person with Mr. Mason's *child-like sensibilities* would assume that he was not free to terminate the interview" Id., p. 13. However, defendant's mental state is not relevant to determining whether he was "in custody". Instead, "the test is an objective one which focuses upon the presence or absence of affirmative indications that the defendant was not free to leave". United States v. Benedict, 104 F. Supp. 2d 175, 178 (W.D.N.Y. 2000) (Larimer, J.). Courts "do not ask police officers to consider . . . contingent psychological factors when deciding whether suspects should be advised of their *Miranda* rights." Yarborough, supra, 541 U.S. at 668.

"The . . . ultimate inquiry in determining whether an individual is in custody is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." Benedict, supra, 104 F. Supp. 2d at 177-78 (citing California v. Beheler, 463 U.S. 1121, 1125 (1983)). Thus, "in the absence of actual arrest, an interrogation is not 'custodial' unless the authorities affirmatively convey the message that the defendant is not free to leave." United States v. Mitchell, 966 F. 2d 92, 98 (2d Cir. 1992); Benedict, supra, 104 F. Supp. 2d at 178. *See also* United States v. Guarno, 819 F. 2d 28, 31-32 (2d Cir.1987) ("in the

absence of arrest something must be said or done by the authorities, either in their manner or approach or in the tone or extent of their questioning, which indicates that they would not have heeded a request to depart or to allow the suspect to do so").

During most of the questioning on July 18 and 22, defendant "was in familiar surroundings: his own home". Benedict, supra, 104 F. Supp. 2d at 178.[10] "While not dispositive, that fact militates against a finding that defendant was in custody. Although defendant . . . might be upset to find police officers in his home conducting a search, being upset does not translate into being in custody. Clearly one's home is a far less intimidating location in which to speak to law enforcement agents than, for example, a police station." Id.

Although defendant was not specifically told that he was free to leave, "no one told him that he could *not* leave. Furthermore, there is little reason to think that a person would even want to leave his own home while it is being searched by law enforcement officers; most people would want to observe what the officers were doing." Id. at 179 (emphasis in original).

While the questioning on July 18 and 22 appears to have lasted approximately two hours on each day, defendant was not in custody, was free to leave or terminate the questioning, and had been advised of his right to have counsel present during the questioning. Gov't. Ex. 2, 10.

### 3.  The Conduct of Law Enforcement Officials

"Facts bearing on that conduct include the repeated and prolonged nature of the questioning or the failure to inform the accused of his constitutional rights . . . whether there was

---

[10]     Although defendant was not at his home when he was asked to open the package on July 18, I conclude that he was not in a custodial setting at that time, since there was no indication that he was not free to leave or to terminate the questioning.

physical mistreatment . . . or long restraint in handcuffs, and whether other physical deprivations occurred . . . . In addition . . . such police conduct might include psychologically coercive techniques such as brainwashing or promises of leniency or other benefits." Green, supra, 850 F. 2d at 902.

Defendant "has not argued that his statements were taken in violation of Miranda. Whether Miranda warnings should have been given is a moot point in this case, since Inspector Blum and Detective Knight testified that they advised Mr. Mason of his rights". Defendant's Post-Hearing Reply Memorandum [82], p. 5.[11] Defendant acknowledged receipt of the warnings as to his right to remain silent and to counsel. See Gov't. Ex. 2, 10. Furthermore, defendant was not under any physical restraint or compelled in any way to speak. Inspector Blum's suggestion to defendant that his cooperation would be brought to the attention of the U.S. Attorney's office does not compel a finding that his statement was involuntary. "In assessing the totality of the circumstances, vague promises of leniency for cooperation are just one factor to be weighed in the overall calculus and generally will not, without more, warrant a finding of coercion." United States v. Gaines 295 F. 3d 293, 299 (2d Cir. 2002); Jaswal, supra, 47 F. 3d at 542.

Nevertheless, defendant argues that he "invoked his right to remain silent on July 22, 2005 by refusing to answer questions and Inspector Blum and Detective Knight violated that right by continuing to question him". Defendant's Post-Hearing Memorandum [78], p. 17. "Once invoked, the right to remain silent must be 'scrupulously honored' by law enforcement by,

---

[11]     The fact that the warnings were given "is not per se evidence that a person is in custody . . . . Warnings provided in a noncustodial setting do not convert that setting into a custodial one for Miranda purposes." United States v. Burnette, 535 F. Supp. 2d 772, 784 (E.D.Tex. 2007); United States v. Charles, 738 F. 2d 686, 693 n. 6 (5th Cir.1984).

for example, waiting a significant period of time before resuming questioning." Id. at 16 (citing Michigan v. Mosley, 423 U.S. 96, 106 (1975)).

However, the prohibition against resumption of questioning applies only to *custodial* interrogation. Mosley, supra, 423 U.S. at 104 ("the admissibility of statements obtained after the person *in custody* has decided to remain silent depends . . . on whether his right to cut off questioning was scrupulously honored") (emphasis added). Where the defendant is *not* in custody, there is no prohibition. *See* Davis v. Allsbrooks, 778 F. 2d 168, 170 (4th Cir. 1985) ("Appellant first asserts that his rights under *Miranda* . . . were violated because detectives continued to question him about Mrs. Wilder's death after he indicated that he no longer wanted to talk. We conclude, however, that appellant was not in custody at the time he was questioned. *Miranda*, therefore, is inapplicable"); Thomson v. Trombley, 2008 WL 4427790, *18 (E.D. Mich. 2008) ("because petitioner's interrogation was not custodial, the police were not required to cease questioning him when he purported to invoke his right to remain silent or to counsel").

Moreover, defendant's "refusal to sign the waiver of rights form does not automatically render the subsequent questioning improper. It may be one of the circumstances which a court will take into account in deciding whether a defendant made statements voluntarily, but an informed, voluntary, *Miranda* waiver of rights does not have to be written to be effective . . . . Nor does a refusal to sign the form automatically indicate a refusal to waive the right to remain silent." United States v. Munoz, 748 F. Supp. 167, 171 (S.D.N.Y. 1990); United States v. Spencer, 995 F. 2d 10, 12 (2d Cir. 1993), cert. denied, 510 U.S. 923 (1993).

Although Inspector Blum's statements to defendant ("now that you know your rights, *you also need to waive your rights* . . . . now that you know what your rights are, *I need you*

-18-

*to waive your rights*" [68/31] (emphasis added)) could be interpreted as a command, I do not believe that defendant understood them as such. Perhaps the most compelling evidence that defendant's free will was not overborne by law enforcement officers is the fact that - on more than one occasion - he *refused* to comply with their requests: he refused to allow them to search his home, he refused to allow them to search his bedroom, and he refused to submit to a polygraph examination. The fact that defendant knew how to say "no" leads me to conclude that his "yes" meant "yes". *See* United States v. Seventy-Three Thousand, Two Hundred Seventy-Seven Dollars, U.S. Currency, 710 F. 2d 283, 291 (7th Cir. 1983) ("it should be pointed out that Steckel was well aware of his right to withhold consent as evidenced by his initial refusal to consent to the search").

Finally, it bears noting that defendant chose not to testify at the suppression hearing. While it is unclear whether that failure gives rise to an adverse inference (Male Juvenile, *supra*, 121 F. 3d at 42 ("we need not decide whether an adverse inference may be drawn from a failure to testify at a suppression hearing")), what *is* clear is that "by not testifying, defendant has failed to contradict the government's evidence . . . . even though he might have done so without risk that anything he said could be later used against him at trial". Id. (citing United States v. Mullens, 536 F. 2d 997, 1000 (2d Cir. 1976)).

Having considered the totality of the circumstances, I find that the government has shown, by a preponderance of the evidence, that defendant's statements and consents on July 18 and 22, 2005 were given intelligently and voluntarily.


**B.      Statement of the Minor Girl**

Defendant also seeks to suppress the minor girl's statement to Detective

Knight that defendant had taken nude photographs of her, arguing that because "there was nothing other than [his] unlawfully obtained July 18, 2005 statement which prompted the officers to question the children at 9 South Chicago Street, the girl's statement must be suppressed as the fruit of the poisonous tree". Defendant's Post-Hearing Memorandum [82], p. 9 (citing Wong Sun v. United States, 371 U.S. 471, 485 (1963)).

Because I have concluded that defendant's July 18 statement was not unlawfully obtained, there is no reason to suppress the minor girl's statement.


### C. Evidence Seized in the July 22, 2005 Search

Finally, defendant argues that the evidence seized during the search of his residence on July 22, 2005 was obtained pursuant to an invalid search warrant, and should therefore be suppressed. Defendant's Post-Hearing Reply Memorandum [82], pp. 10-11. "The record suggests that [Inspector Blum] deliberately omitted from the warrant application the following facts: (1) that Mr. Mason was mentally impaired; (2) that he was coerced into making a statement regarding the girl at 9 South Chicago Street; and (3) that he refused to consent to the search of his mother's home. Defendant submits that because these omissions were false, deliberate and material, and the remaining content of the search warrant is insufficient to establish probable cause that Mr. Mason was involved in the production of child pornography, the fruits of the warrant must be suppressed." Id.

I disagree. With respect to the first allegedly concealed fact, the record does not compel the conclusion that Inspector Blum should have known that defendant was mentally impaired. As stated previously, I believe that defendant's references to his brain being "messed up"

could be interpreted as attempts to avoid culpability for his actions. With respect to the second allegedly concealed fact, I have already concluded that defendant was not coerced into making a statement regarding the minor girl.

The third allegedly concealed fact is more troublesome, because the record is clear that defendant refused consent to search the premises. Therefore, the fact that his mother may have consented is irrelevant, since "a physically present inhabitant's express refusal of consent to a police search is dispositive as to him, regardless of the consent of a fellow occupant". Georgia v. Randolph, 547 U.S. 103, 122-123 (2006). However, that is not the end of my inquiry, for the evidence must be excluded only if defendant "establishes by a preponderance of the evidence that the false statement was included in the affidavit by the affiant knowingly and intentionally, or with reckless disregard for the truth, *and the false statement was necessary to the finding of probable cause*". Franks v. Delaware, 438 U.S. 154, 155 (1978) (emphasis added). "The ultimate inquiry is whether . . . there remains a residue of independent and lawful information to support probable cause." United States v. Martin, 426 F. 3d 68, 74 (2d Cir. 2005), cert. denied, 547 U.S. 1192 (2006).

In making that determination, I note that the "probable-cause determination is not overly strict. Presented with a warrant application, the judge must simply . . . make a *practical, common-sense decision* whether, given all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a *fair probability* that contraband or evidence of a crime will be found in a particular place." Id. (emphasis in original).

The affidavit in support of the July 21, 2005 search warrant [Gov't. Ex. 8] details defendant's admitted purchases of child pornography and his admitted taking of naked photographs of young girls. Even assuming that Inspector Blum should have disclosed the fact that defendant refused consent to search his premises, I conclude that the affidavit "after being corrected for the [alleged] error, still supports a probable-cause finding . . . [and therefore] need not reach the question of whether the [alleged] misstatements were made knowingly or recklessly". Martin, supra, 426 F. 3d at 74.

## CONCLUSION

For these reasons, the government's motion *in limine* [62] is DENIED, and I recommend that defendant's motion to suppress [36] likewise be DENIED. Pursuant to 28 U.S.C. §636(b)(1), it is hereby

ORDERED, that this Report, Recommendation and Order be filed with the Clerk of the Court.

ANY OBJECTIONS to this Report, Recommendation and Order must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report, Recommendation and Order in accordance with the above statute, Fed. R. Crim. P. ("Rule") 58(g)(2) and Local Rule of Criminal Procedure 58.2.

The district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but was not presented to the magistrate judge in the first instance. See, e.g., Patterson-Leitch Co. v. Massachusetts Mun. Wholesale Electric Co., 840 F. 2d 985 (1st Cir. 1988).

Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order. Thomas v. Arn, 474 U.S. 140 (1985); Wesolek v. Canadair Ltd., 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 58.2 of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." Failure to comply with the provisions of Local Rule 58.2, or with the similar provisions of Local Rule 58.2 (concerning objections to a Magistrate Judge's Report, Recommendation and Order), may result in the District Judge's refusal to consider the objection.

**SO ORDERED.**


DATED:      June 1, 2009

                                    _____
                                    JEREMIAH J. MCCARTHY
                                    United States Magistrate Judge